# EXHIBIT A

# trellis

Date:

April 7th, 2026

CASE NUMBER: 50-2026-CA-000377-XXXA-MB

# COMPLAINT - F/B PLT

Document prepared for:

Attorney Jeff Sewell

| **CASE NAME** | **DOCUMENT FILED DATE** |
|---|---|
| BACHMAN, BRIDGET V UBER TECHNOLOGIES INC | Jan. 13th, 2026 |

| **CASE FILING DATE** | **COUNTY** |
|---|---|
| Jan. 13th, 2026 | Palm beach county, FL |

| **CATEGORY** | **STATUS** |
|---|---|
| OTHER NEGLIGENCE | Open |

trellis.law/doc/273174973/complaint-f-b-plt

Case 9:26-cv-80391-EA   Document 1-1   Entered on FLSD Docket 04/07/2026   Page 3 of 43

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, STATE OF FLORIDA

BRIDGET BACHMAN,                                       CASE NO.:

      Plaintiff,

vs.

UBER TECHNOLOGIES, INC.,
a Delaware Corporation; and,
RASIER, LLC, a Delaware Limited
Liability Company,

      Defendants.

_____/

## **COMPLAINT**

Plaintiff, BRIDGET BACHMAN, by her undersigned counsel, makes the following Complaint against Defendants Uber Technologies, Inc., A Delaware Corporation, and Raiser, LLC ("Raiser"), (collectively, "Uber" or "Defendants"), alleging as follows:

### **NATURE OF ACTION**

1. Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by an Uber driver with whom she had been paired through the Uber App.

2. As a common carrier, Uber is vicariously liable for the injuries its driver inflicted on its passenger.

3. In addition, through its officers, directors, and managing agents, Uber contributed to the attack on plaintiff by abandoning its duty of heightened care toward its passengers, and

instead adopting a culture that prized growth and exploited and endangered women and girls in conscious disregard for their rights and safety.

4.     Uber is a transportation company headquartered in San Francisco, California that, beginning in 2009, pioneered an app-based transportation system implemented around the world, including across the entire United States and in this State.

5.     As early as 2014 Uber became aware that Uber drivers were physically and/or sexually assaulting and raping female passengers.

6.     In the nine years since, sexual predators driving for Uber have continued to sexually assault, harass, kidnap, physically assault, rape, and/or other attack Uber's passengers.

7.     Complaints to Uber by female passengers who had been attacked by Uber drivers, combined with subsequent criminal investigations by law enforcement, clearly establish that Uber has been fully aware of these continuing attacks by sexual predators driving for Uber.

8.     Uber's response to these ongoing sexual assaults by Uber drivers has been slow and inadequate and has put the lives and well-being of its customers at grave risk.

9.     While Uber has, in recent years, publicly acknowledged this sexual-assault crisis—including through the publication of Uber's U.S. Safety Report in December 2019—Uber has failed to implement basic safety measures necessary to prevent these serious physical and/or sexual assaults, which continue to occur to this day.

10.     As more fully set forth below, Plaintiff was assaulted, battered, harassed, and attacked by the Uber driver she was led to believe would give her a safe ride to her destination.

11.     The Uber ride at issue was ordered by Plaintiff through the ride-sharing software application owned and controlled by Uber ("the Uber App").

12.     At all relevant times Defendants Uber and Rasier (collectively "Uber") operated and controlled the Uber App.

13.     The Uber driver, while in the course and scope of his employment for Uber and while otherwise working on behalf of Uber, assaulted, battered, harassed, and/or attacked Plaintiff as set forth below.

14.     Plaintiff brings this civil action against Uber to recover damages for the injuries she suffered as a result of being assaulted, battered, harassed, and/or attacked by the Uber driver during an Uber ride.

15.     Uber is a common carrier under this State's laws.

## PARTIES

16.     Plaintiff is over the age of 18 and is a resident of Florida.

17.     The assault described below took place in the state of Florida.

18.     Plaintiff files this action as a victim of sexual assault.

19.     Defendant Uber Technologies, Inc. is a Delaware corporation with its corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, San Francisco County, California, 94158.

20.      Defendant Rasier, LLC is a Delaware limited liability company.

21.     On information and belief, Rasier is a wholly owned subsidiary of Uber Technologies, Inc.

22.     Rasier maintains its corporate headquarters, principal office, and principal place of business at 1515 3rd Street, San Francisco, California, 94158.

23.     Unless otherwise specified, this Complaint refers to Defendants Uber Technologies, Inc. and Rasier, LLC collectively as "Uber."

24.     The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of Doe 1, are unknown to Plaintiff who therefore sues said Defendants by such fictitious names.

25.     The full extent of the facts linking such fictitiously sued Defendant is unknown to Plaintiff.

26.     Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein as a Doe was, and is, negligent, or in some other actionable manner responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally caused the hereinafter-described injuries and damages to Plaintiff.

27.     Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the Defendants' true names and capacities after the same have been ascertained.

28.     Plaintiff is informed and believes, and on that basis alleges, that at all relevant times, each Defendant was the agent, servant, licensee, employee, assistant, consultant, or alter ego of each other Defendant, and was at all relevant times acting within the course and scope of said relationship when Plaintiff was injured.

29.     Plaintiff is informed and believes that each Defendant, when acting as a principal, was negligent in the selection, hiring, supervision, or retention of each other Defendant as an agent, servant, employee, assistant, or consultant.

30.     Plaintiff is further informed and believes that at all relevant times, each Defendant, through its officers, directors, supervisors and managing agents, and each individual Defendant, had advance knowledge of the wrongful conduct, psychological profile, and behavior propensity of said agents, servants, licensees, employees, assistants, consultants, and alter egos, and allowed said wrongful conduct to occur and continue to occur, thus ratifying said wrongful conduct.

31.     After becoming aware of the wrongful conduct, each Defendant, by and through its officers, directors, supervisors, and managing agents, and each individual Defendant, authorized and ratified the wrongful conduct that injured Plaintiff.

32.     Defendants are liable for the acts of each other through principles of respondeat superior, agency, ostensible agency, partnership, alter-ego, and other forms of vicarious liability.

33.     The Uber driver who perpetrated the assault described herein ("Uber driver") was an agent, servant, and employee of Uber.

34.     This Complaint refers to Defendant Uber Technologies, Inc., Defendant Rasier, LLC, and Doe 1, inclusive, as Defendants.

## RELEVANT FACTUAL BACKGROUND

35.     Uber is a transportation company.

36.     In 2010, one of its founders, Travis Kalanick, 15 became its second chief executive officer and—at one time—its largest shareholder.

37.     Uber drivers and Uber split the fare Uber charges riders for the riders' trips.

38.     In 2014, Uber started charging Uber passengers an extra $1 fee for each trip.

39.     Uber called this a "Safe Rides Fee."

40.     When Uber announced the "Safe Rides Fee," it told the public that the "[f]ee supports our continued efforts to ensure the safest possible platform for Uber riders and drivers, including an industry-leading background check process, regular motor vehicle checks, driver safety education, development of safety features in the app, and insurance."

41.     The "Safe Rides Fee" was not split with drivers.

42.      It was pure revenue for Uber.

43.     Uber collected its "Safe Rides Fee" on hundreds of millions of rides and made hundreds of millions in revenue from the fee.

44.     But it never earmarked the money for improving safety or spent it on safety.

45.     Instead, it pocketed the money it told the world it was going to directly towards enhancing safety.

46.     As a former Uber employee said "[w]e boosted our margins saying our rides were safer." It "was obscene."

47.     Rider safety was never Uber's concern. Growth was.

48.     To increase growth, which required not only new riders but new drivers, Travis Kalanick and the executives at Uber made it as easy as possible for Uber drivers to sign up.

49.     They used a background-check system designed to get drivers approved as quickly and conveniently as possible.

50.     Uber hired Hirease, Inc. to do its background checks.

51.     Hirease brags that it can vet drivers within 36 hours.

52.     To have such a short turnaround, Uber eschewed industry standards used by other taxi companies and livery services.

53.     For example, Uber abandoned fingerprinting—which takes weeks—and running applicant drivers against private databases, such as FBI records.

54.     These shortcuts led to growth for Uber.  But they put people, including Plaintiff, in danger.

55.     Indeed, Uber was so fixated on growth that it began mailing cell phones to applicant drivers, so they could begin driving, before Uber's cursory and ineffective background check was even complete.

56.     Travis Kalanick made the decision that Uber was not going to fingerprint its drivers and that it was not going to scrub applicant drivers against FBI records.

57.     Rather, the decision was made to use a fast and shallow background check process.

58.     Travis Kalanick also made the decision not to interview drivers or train drivers to ensure Uber's drivers understood their responsibilities and what was appropriate and inappropriate when interacting with passengers.

59.     Mr. Kalanick decided not to implement policies to protect passengers from sexual assault—policies such a zero-tolerance policy with respect to fraternizing or making sexual advances towards passengers, and most certainly with respect to engaging in sexual activity with or sexual touching of passengers.

60.     Mr. Kalanick had actual knowledge that these decisions would put passengers in greater danger.

61.     As such, he acted with conscious disregard for the rights and safety of female passengers, including Plaintiff.

62.     Travis Kalanick intentionally performed the act of hiring drivers without fingerprinting them, without running them through the FBI databases, and using fast and shallow background checks.

63.     When he took these actions, he knew or should have known that it was highly probable that harm would result.

64.     This quick-and-dirty approach represented a deliberate choice to gamble with passenger safety.

65. When Uber's current Chief Executive Officer, Dara Khosrowshahi, assumed that role in August 2017, he continued the policy of hiring drivers without biometric fingerprinting to be run through the FBI database.

66. This was a very intentional and deliberate decision, evidenced by Uber's active lobbying and resistance against municipalities or regulatory bodies implementing any kind of biometric fingerprinting requirement for drivers.

67. Uber's policy is that it will not report any criminal activity it learns of to law-enforcement authorities.

68. That includes allegations of sexual assault.

69. Thus, Uber's policy is that if it learns from an Uber rider, such as Plaintiff, that she was sexually assaulted, Uber will not report this sexual assault to law enforcement.

70. Uber is proud of this policy and feels "very strongly" that it is not Uber's job to go to the to the police on behalf of customers when an Uber driver rapes an Uber passenger.

71. Uber CEO Mr. Khosrowshahi has supported this non-reporting policy.

72. When he took the action of intentionally embracing this policy, he knew or should have known that it was highly probable that harm would result.

73. After all, drivers will feel less constrained to commit sexual assault if they know it is less likely that law enforcement will be informed.

74. Mr. Kalanick and Uber's leadership and board were the fountainhead of Uber's culture of reckless growth, misogyny, and lawlessness.

75. When Uber customers accused Uber drivers of sexual assault—something that happened with increasing frequency as Uber grew, given its lax supervision and shoddy background checks—Mr. Kalanick would pace around Uber headquarters, not wondering about

how to improve rider safety but repeating the bromide, legally correct but a bromide nonetheless, "innocent until proven guilty."

76.     When law enforcement decided not to bring criminal charges against an Uber driver accused of sexual assault because it felt it did not have enough evidence for a criminal conviction, "a round of cheers would ring out across the fifth floor of Uber HQ."

77.     The actions of Uber's executives and board members demonstrate Uber's contempt for women and myopic focus on profits.

78.     Uber only cares about growth.

79.     This culture permeates the entire company and endangers Uber's female riders.

80.     Sarah Fowler wrote an explosive blog post, describing how pervasive this culture was at Uber.

81.     In an attempt to buff its tarnished reputation, Uber also hired former Attorney General Eric Holder and his law firm, Covington & Burling LLP, to investigate Uber's culture and work-place environment.

82.     During his investigation, as detailed in the publicly released "Holder Report," Attorney General Holder uncovered "a winding, repetitive list of infractions that had occurred across hundreds of global offices, including sexual assault and physical violence."

83.     As Uber's sexual-assault and harassment problems publicly ballooned, it made pale and perfunctory attempts to act as though it is trying to confront them.

84.     In May 2018, Uber acknowledged the "deeply rooted problem" of sexual assault and proclaimed it was committed to solving the problem, stating that "we're making some important changes today."

85.     Included in these "important changes" was Uber's promise to publish a "safety transparency report that will include data on sexual assaults . . . that occur on the Uber platform."

86.     Uber explained its commitment to publishing such data because "transparency fosters accountability."

87.     Uber further explained that "sexual predators often look for a dark corner" and announced to the world that "we [Uber] need to turn the lights on."

88.     Despite these promises, Uber persisted in darkness and did not release any data on sexual assaults for another year and a half.

89.     When Uber finally released a report in December 2019, it was forced to acknowledge that there were 5,981 sexual assaults in the United States during Uber trips recorded in 2017 and 2018.

90.     Uber did not release a second safety report for more than two years.

91.     On December 2, 2021, the California Public Utilities Commission approved a settlement agreement with Uber on reporting of data on sexual harassment and assault in which Uber agreed to pay $9 million and provide information on sexual assault and harassment to the CPUC on a going-forward basis.

92.     It was another six months after Uber agreed to provide these data to the CPUC before Uber publicly released another safety report per its commitment in May 2018.

93.     In July 2022, it released a report covering 2019 and 2020 (a year when its ridership was decimated by the pandemic) stating it received 3,824 sexual-assault reports for that time period.

94.     Uber's own data confirms that sexual assaults by Uber drivers continue to occur at an unacceptable rate.

95.     Uber has not released any sexual-assault data for 2021 or 2022.

96.     Uber's decision to withhold that data prevents Uber passengers and the public from understanding the true rate at which such assaults continue to occur each day.

97.     As Uber became more popular, more people realized Uber had so lowered the bar that people with checkered backgrounds could drive for Uber.

98.     People also realized that Uber had not provided everything necessary for safe rides, that is, everything that might make it more difficult to get away with sexual assaults, like video cameras in cars.

99.     In addition, they recognized Uber was at the same time marketing itself to women as a safe mode of transportation, including after drinking.

100.    Because of these factors, Uber became a magnet for sexual predators—men who knew that driving for Uber meant they would get to drive intoxicated women late at night.

101.    These men started sexually assaulting women at alarming rates, as the Holder Report shows.

102.    And, as stated earlier, Uber and its officers, directors, and managing agents—including Mr. Kalanick—had actual knowledge that these sexual assaults were going on, on the platform and women were being hurt. But they did nothing.

103.    They failed to start screening drivers better and failed to place video cameras in cars.

104.    They intentionally refused to implement these safety measures despite actual knowledge of the problem, and these officers, directors, and managing agents—including Mr. Kalanick—had actual or constructive knowledge that refusing to do so meant there was a high probability that more female passengers would be harmed, which—foreseeably—is what

happened to Plaintiff.

## THE ATTACK ON PLAINTIFF

105.   This action arises from the serious harm Plaintiff, Bridget Bachman, suffered as a result of the wrongful acts and omissions of Defendants.

106.   On or about July 28, 2024, Plaintiff was a lawful business invitee riding in an Uber vehicle.

107.   She had requested transportation for legitimate and ordinary purposes, relying on Uber's representations of safety, reliability, and passenger protection.

108.   During this ride, Plaintiff was subjected to an unwanted, inappropriate, and offensive sexual assault by the Uber driver.

109.   The driver made intrusive comments and engaged in physical contact that was wholly unwarranted, uninvited, and deeply distressing.

110.   Prior to reaching Plaintiff's destination, the Uber driver pulled the vehicle over without any request, need, or consent from Plaintiff, creating an isolated and vulnerable environment.

111.   Once stopped, the driver initiated the unwanted physical contact by groping and touching Plaintiff in an inappropriate, invasive, and sexually suggestive manner, escalating the assault and heightening Plaintiff's fear, humiliation, and sense of helplessness.

112.   The Uber driver's conduct included touching Plaintiff in an inappropriate, invasive, and sexually suggestive manner, which caused Plaintiff immediate fear, humiliation, and emotional shock.

113.   At all relevant times, Plaintiff was entitled to be transported safely, free from any offensive conduct, harassment, or assault.

114. She reasonably relied on Uber's widespread public representations that its drivers were screened, vetted, trained, and monitored to ensure passenger safety.

115. As a direct result of the sexual assault, Plaintiff suffered both physical injury and severe emotional and psychological trauma.

116. She required treatment from multiple healthcare providers for the physical effects of the incident and sought mental health counseling for the emotional consequences of the attack.

117. Plaintiff obtained treatment from mental health providers, where she continued to receive care for anxiety, distress, trauma, and emotional instability resulting directly from the assault.

118. Despite ongoing treatment, Plaintiff continues to suffer from the physical manifestations of the assault and the long-term psychological impact of being violated by a driver entrusted with her safety.

119. At the time of the incident, Defendants owed Plaintiff a duty to exercise reasonable care to ensure that their vehicle, driver, and transportation services were safe for lawful customers such as Plaintiff.

120. Defendants breached that duty by failing to properly screen, supervise, train, and monitor the Uber driver who sexually assaulted Plaintiff, and by failing to implement adequate safeguards to prevent assaults on passengers.

121. This breach of duty directly and proximately caused Plaintiff's injuries, including physical pain, emotional trauma, mental anguish, and the need for ongoing medical and mental health treatment.

122. Plaintiff's injuries continue to affect her daily life.

123. She lives with ongoing psychological harm, fear, and emotional distress that are reasonably certain to persist well into the future.

124. Defendants' conduct demonstrated a conscious disregard for the safety of passengers who rely on Uber's transportation services.

125. The risks of sexual misconduct by rideshare drivers were known—or should have been known—to Defendants, yet Defendants failed to take reasonable steps to mitigate those dangers.

126. As a direct and foreseeable result of the sexual assault perpetrated by the Uber driver, and Defendants' negligent acts and omissions, Plaintiff has suffered and continues to suffer damages, including physical harm, emotional distress, psychological trauma, and ongoing medical needs.

**COUNT I**

**GENERAL NEGLIGENCE**

127. Plaintiff incorporates all prior allegations.

128. By providing transportation to the general public using its application and network of drivers, Uber owed a duty to act with due and reasonable care towards the public and in particular its own passengers, including Plaintiff.

129. Uber has been on notice that its drivers have been sexually harassing, sexually assaulting, and raping its passengers since at least 2014. Uber was aware or should have been aware that some Uber drivers would continue to sexually assault, stalk, harass, kidnap, physical assault, rape, and/or otherwise attack their vulnerable Uber patrons and passengers.

130. Since learning of the sexual assaults perpetrated by its drivers, Uber never adapted or improved its safety procedures in any meaningful way.

131.    Uber does not require video monitoring of its drivers that cannot be turned off, nor does it provide emergency notification to law-enforcement authorities when a driver drastically veers off course from the passenger's destination, abruptly cancels the ride, or ends the ride at the intended destination but GPS data indicates the passenger remains in the car for a significant period of time.

132.    At all times relevant, Uber was well aware of the dangers its drivers posed, yet it still induced, and continues to induce, the public, including Plaintiff, to rely on Uber as a safe means of transportation. In doing so, Uber failed to warn passengers, including Plaintiff, of the possibility of being assaulted, battered, harassed, and/or otherwise attacked by an Uber driver.

133.    At the time Plaintiff was assaulted, Uber did not require sexual harassment/assault training for its drivers, nor did it have any policies in place for immediate termination if a driver engages in sexual misconduct.

134.    Uber does not cooperate with the police when a driver commits an illegal sexual attack on its passengers. Despite having the express right to disclose driver information at Uber's sole discretion, Uber requires that extensive standards be met before the company will even consider law enforcement requests for information. Even after a report of sexual assault has been made, Uber generally requires a subpoena before it will release information. Uber's policy of noncooperation discourages police agencies from making recommendations to local prosecutors to file complaints against Uber drivers and provides Uber's predatory drivers with tacit assurance that their illegal attacks will not be detected by law enforcement.

135.    When hiring new drivers, Uber does not verify driver identities with biometric background checks. Uber does not correct for false negatives created by its name-based screening procedures. Uber does not provide industry-standard background checks that would

Page 15 of 41

provide the most comprehensive means of screening applicant drivers. Uber does not invest in continuous monitoring of its drivers and is not immediately alerted when one of its drivers is implicated in criminal acts.

136. Uber does not have a consistent, reliable system for addressing passenger report of sexual assault by its drivers and continues to let dangerous predators drive for and earn money for Uber.

137. For the above reasons and others, Uber breached its duty of reasonable care to Plaintiff.

138. As a legal and direct result of Uber's actions and omissions, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by an Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The assault on Plaintiff caused her to suffer psychological and physical harm from which she may never fully recover.

139. As a direct and proximate result of Defendants' general negligence, Plaintiff suffered economic and non-economic damages.

140. Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

## CLAIM 2: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

141.    Plaintiff incorporates all prior allegations.

142.    Uber engaged and retained or otherwise employed the Uber driver who assaulted, harassed, and/or otherwise attacked Plaintiff as described above.

143.    Uber did not interview, check the references of, provide training to, or advise the

144.    Uber driver of any anti-sexual assault policies when hiring him. Uber had no reasonable basis for believing Uber drivers in general were fit to drive vulnerable women around, particularly at night, and failed to use reasonable care in determining whether the driver in question was fit for the task.

145.    Uber should have known of the unfitness of the Uber driver involved in the assault on Plaintiff but failed to use reasonable care to discover his unfitness and incompetence.

146.    Despite failing to reasonably endeavor to investigate the incompetence of Uber drivers, including the one who harmed Plaintiff, for transporting vulnerable and/or intoxicated women in a moving vehicle, Uber hired said driver to do exactly that.

147.    Uber knew or should have known that assigning the task of transporting vulnerable passengers to an inadequately screened driver created an unreasonable risk of harm to Uber's passengers, including Plaintiff, particularly when Uber had been on notice of the string of sexual assaults committed by Uber's drivers.

148.    Uber failed to employ measures to adequately supervise its drivers.

149.    Uber failed to adequately record, investigate, and respond to passenger reports of unsafe conduct such as sexual harassment and sexual assault by Uber drivers.

150.    Uber was negligent in failing to terminate drivers it knew or reasonably should have known were a threat to passengers, including but not limited to Plaintiff and other vulnerable female passengers traveling alone.

151.    The Uber driver who assaulted Plaintiff was, and/or became, unfit to perform the work for which he was hired as he improperly and illegally took advantage of Plaintiff when she attempted to use the service for a safe ride to her destinations, which caused her psychological and/or physical harm.

152.    Because of the Uber driver's unfitness to perform the task of transporting Plaintiff, Plaintiff was assaulted, harassed, battered, and/or otherwise attacked, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety.

153.    Uber's negligence in hiring, retaining, and or supervising Uber drivers, including the driver who harmed Plaintiff, caused Plaintiff to be assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

154.    As a direct and proximate result of Defendants' negligent supervision, hiring, and retention of Uber drivers, including the driver who harmed Plaintiff, Plaintiff suffered economic and non-economic damages.

155.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper,

including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

## CLAIM 3: COMMON-CARRIER NEGLIGENCE

156.   Plaintiff incorporates all prior allegations.

157.   At the time Plaintiff was sexually assaulted, Uber was a common carrier as it provided transportation, generally and indifferently, to the general public.

158.   Uber provides transportation through a digital application and transportation network made available to the general public, generally and indifferently, for the purpose of transporting its users, the passengers, from place to place for profit. Uber has widely offered its services to the general public and charges standard fees for its services through its application.

159.   Uber represents that it does not allow discrimination against passengers on the basis of race, color, national origin, religion, gender, gender identity, physical or mental disability, medical condition, marital status, age, or sexual orientation. Any member of the public can use Uber's services for transportation.

160.   Uber is registered with the State of California, Public Utilities Commission, as a Transportation Network Company, which is "defined as an organization . . . that provides prearranged transportation services for compensation using an online-enabled application (app) or platform to connect passengers with drivers using their personal vehicles." (CPUC Decision 13-09-045, Rulemaking 12-12-011, September 19, 2013.)

161.   As a common carrier, Uber must carry its passengers, including Plaintiff, safely.

162.   Uber has a duty to employ the utmost degree of care and diligence that would be expected of a very cautious company. Uber has a duty to do all that human care, vigilance, and

foresight reasonably can do under the circumstances to avoid harm to passengers, including Plaintiff.

163.    Uber must use reasonable skill to provide everything necessary for safe transportation, in view of the transportation used and the practical operation of the business.

164.    Despite complaints to Uber of physical and/or sexual assaults committed by Uber drivers and lawsuits against Uber for physical and/or sexual assault, to this day Uber has failed to implement safety precautions that would adequately address its assault problem.

165.    Uber does not provide a consistent and reliable way for passengers to report physical and/or sexual abuse.

166.    Uber does not warn passengers of the dangers of riding with Uber and fails to warn passengers of past complaints regarding Uber drivers.

167.    Uber does not have an effective program in place to deal with the sexual-predator crisis posed by some of its drivers.

168.    Uber knows its female passengers are in a uniquely vulnerable situation enclosed in a moving vehicle and that a subset of its drivers are sexual predators.

169.    Uber has not exercised reasonable care to protect its passengers from harassment and assault by Uber's drivers.

170.    Uber has not exercised the utmost degree of care in order to protect its passengers from the danger posed by sexual predators who drive for Uber. If Uber had used the highest degree of care, Uber could have prevented or dramatically reduced the likelihood of the physical and/or sexual assault of its passengers, including Plaintiff.

171.    Uber failed to safely transport Plaintiff.

172.     Uber failed to use the utmost care and vigilance to protect Plaintiff from its own driver who assaulted, harassed, and/or otherwise attacked Plaintiff while she was being transported by Uber.

173.     Uber failed to take reasonable precautions to protect its vulnerable female passengers, including Plaintiff, from the foreseeable and known risk of assault and/or harassment by its drivers. If Uber had used the highest degree of care, Uber could have prevented or reduced the likelihood of the sexual assault of its passengers, including Plaintiff.

174.     As a legal and proximate result of Uber's actions and omissions of Uber, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

175.     As a direct and proximate result of Uber's negligence as a common carrier, Plaintiff suffered economic and non-economic damages.

176.     Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

## CLAIM 4: NEGLIGENT FAILURE TO WARN

177.     Plaintiff incorporates all prior allegations.

178. Uber's conduct created a risk of physical or emotional harm to its passengers, including Plaintiff.

179. In operating its business, Uber knew and had reason to know that its passengers were at risk of sexual assault and abuse by Uber's drivers since at least 2014. Since then, Uber has received frequent passenger complaints about driver misbehavior, has been notified of police investigations of drivers' criminal conduct while acting in their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Uber's passengers by Uber's drivers.

180. Despite the knowledge of the danger its enterprise created, Uber prioritized profits over passenger safety and did not alert its passengers, including Plaintiff, to the risk of physical and/or sexual assault by Uber drivers. In fact, Uber continued to market itself as a service that provides "safe" rides, even to unaccompanied and/or intoxicated passengers, knowing sufficient measures had not been employed to keep passengers safe from being physically and/or sexually assaulted.

181. Uber itself represented to its passengers that riding with Uber is safe, implying it is free of risk from physical and/or sexual assault.

182. Uber did not warn that its criminal background checks of Uber drivers were limited, nor did it warn that it sometimes allows drivers to continue driving for Uber even after a passenger reports to Uber that she was physically and/or sexually assaulted.

183. Uber had reason to know that passengers would be unaware of the risk of physical and/or sexual assault by Uber drivers.

184. A warning to its passengers that they were at risk of physical and/or sexual assault by Uber drivers would have reduced the risk of harm to passengers, including Plaintiff, who

could have arranged for alternative transportation or taken additional safety precautions and avoided the assaults they suffered at the hands of Uber drivers.

185.    Plaintiff would not have ridden alone in an Uber had Uber provided an adequate warning regarding the risk of being assaulted, battered, harassed, and/or otherwise attacked by an Uber driver.

186.    As a legal and proximate result of Uber's actions and omissions, Plaintiff was assaulted, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

187.    As a direct and proximate result of Defendants' negligent failure to warn, Plaintiff suffered economic and non-economic damages.

188.    Plaintiff will seek actual and punitive damages based on Defendants' above described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

### CLAIM 5: INTENTIONAL MISREPRESENTATION

189.    Plaintiff incorporates all prior allegations.

190.    At the time Plaintiff was assaulted, battered, harassed, and/or otherwise attacked, she had downloaded the Uber App and had an account with Uber.

191.    Uber represented to Plaintiff and the general public that safety was Uber's top priority, and it was Uber's goal to make every ride safe, comfortable, and reliable. At the same time, Uber already knew that a number of its drivers had preyed on vulnerable female passengers by sexually molesting, assaulting, harassing, and/or raping them.

192.    Uber made intentional misrepresentations of fact to all users of the Uber App, including Plaintiff, that were known by Uber to be false including the false statements Uber made, stating it would provide Plaintiff with a safe ride to her destination.

193.    These representations regarding safety were made to Uber customers, including Plaintiff, through periodic emails Uber sent to its customers, social-media advertisements, and Uber's own website and app. Plaintiff relied upon several advertisements and statements where Uber proclaimed it would provide a safe ride. Plaintiff read Uber's self-promoting statements regarding safety both before and after Plaintiff was assaulted, harassed, battered, and/or otherwise attacked by the Uber driver.

194.    Prioritizing profits over passenger safety, Uber made these intentional misrepresentations of material fact to induce women, including Plaintiff, to use Uber's services.

195.    Uber made these representations to Plaintiff and the general public despite knowing it had chosen not to take the measures necessary to provide a safe ride to her intended destination and, as a result, continued physical and/or sexual assault of its passengers by its drivers was a foreseeable occurrence.

196.    Uber made these representations to induce women, like Plaintiff, to use Uber's services and to derive profit from women like Plaintiff.

197.    In ordering and entering an Uber vehicle, Plaintiff reasonably relied on Uber's representations that it would get her safely to her destination.

198. In trusting and relying on Uber's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by the Uber driver who assaulted, harassed, and/or otherwise attacked Plaintiff.

199. As a direct and proximate result of Uber's intentional misrepresentations, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

200. As a direct and proximate result of Uber's intentional misrepresentations, Plaintiff suffered economic and non-economic damages.

201. Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

## CLAIM 6: NEGLIGENT MISREPRESENTATION

202. Plaintiff incorporates all prior allegations.

203. Uber represented to Plaintiff and the general public that safety is Uber's top priority, and that it is Uber's goal to make every ride safe, comfortable, and reliable. At the time of the assault alleged, Uber knew that a number of its drivers had previously preyed on vulnerable female passengers by sexually molesting, assaulting, harassing, and/or raping them.

204. Uber continued to represent that its services were safe to further Uber's own pecuniary interests.

205. In choosing to represent to its customers/users that its services were safe, Uber had a duty to provide correct and accurate information about the actual safety of its services.

206. Uber knew or should have known that it could not provide the safe ride that it represented it could.

207. Knowing of the incidence of sexual assault of its passengers by its drivers and knowing that Uber had not implemented adequate precautions, Uber had no reasonable grounds for believing that it could provide Plaintiff and other passengers a safe ride as represented.

208. In getting into the Uber, Plaintiff reasonably relied on Uber's representations that it would get her safely to her intended destination.

209. In trusting and relying on Uber's representations, Plaintiff was placed in a uniquely vulnerable position that was taken advantage of by an Uber employee, the Uber driver, who assaulted, battered, harassed, and/or otherwise attacked Plaintiff.

210. As a direct and proximate result of Uber's conduct, Plaintiff was assaulted, harassed, battered, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed her of her dignity and personal safety. The depraved attack on Plaintiff caused her to suffer physical and/or psychological harm from which she may never fully recover.

211. As a direct and proximate result of Uber's negligent misrepresentations, Plaintiff suffered economic and non-economic damages.

212. Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

## CLAIM 7: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

213. Plaintiff incorporates all prior allegations.

214. For several years before Plaintiff was assaulted by the Uber driver, Uber was fully aware that other female passengers had been assaulted by Uber drivers. Since at least 2014, Uber has received frequent passenger complaints about driver misconduct, has been notified of police investigations of the criminal conduct of drivers acting within their capacity as Uber drivers, and has been the subject of numerous civil suits alleging the sexual harassment and assault of Uber's passengers by Uber's drivers.

215. Uber made a conscious decision not to implement procedures that would effectively screen its drivers and monitor its drivers to identify and terminate drivers who were sexual predators.

216. Safety precautions such as enhanced background checks, biometric fingerprinting, job interviews, electronic monitoring systems, warnings to passengers of the dangers of being attacked by Uber drivers, and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage. Because of this, Uber decided not to implement such precautions and instead continues to place its passengers at greater risk of assault and harassment by Uber's own drivers.

217. Additional safety precautions that Uber chose not to make include but are not limited to: ongoing monitoring of Uber drivers through available technology including cameras

and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers, or by deviating substantially from the assigned route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; creating and instituting a system encouraging customer reporting; and adequate monitoring of customer complaints by well-trained and effective customer-service representatives. Uber chose not to implement such precautions, nor did it warn passengers of the risk of being physically and/or sexually assaulted given that these safety precautions had not been implemented.

218.    In failing to take these and other safety precautions designed to protect passengers from sexual predators driving for Uber, Uber breached its duty of reasonable care, negligently inflicting emotional harm upon Plaintiff, and acted recklessly and in conscious disregard of her safety.

219.    As a direct and proximate result of Uber's negligent infliction of emotional distress, Plaintiff suffered economic and non-economic damages.

220.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

## CLAIM 8: BREACH OF CONTRACT

221.    Plaintiff incorporates all prior allegations.

222.     Plaintiff entered a contract with Uber. The essence of this commercial transaction was the payment of a fee to Uber in exchange for safe and reasonable transportation to Plaintiff's destination.

223.     As a result of the conduct, acts, and omissions set forth above, Uber breached its contract with Plaintiff, including breaching implied covenants inherent in such a contract.

224.     As a direct and proximate result of Uber's breach of contract, Plaintiff suffered economic and non-economic damages.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

## CLAIM 9: STRICT PRODUCT LIABILITY BASED ON DESIGN DEFECT OF THE UBER APP AND FAILURE OF THE UBER APP TO MEET MINIMUM REASONABLE CONSUMER SAFETY EXPECTATIONS

225.     Plaintiff incorporates all prior allegations.

226.     Uber manufactured and distributed the Uber App.

227.     The Uber App did not perform as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way, because the Uber App falsely led Plaintiff to form a reasonable minimum safety expectation that was not met.

228.     The Uber App did not include safety features such as a GPS tracking system that would alert Uber to the early termination of a ride, substantial deviation from the intended route, or a passenger continuing to travel in the Uber vehicle after the driver ended the ride in the app. It also did not include the automatic activation of the camera in drivers' smart phones when a

ride is in progress. And it did not include automatic notification of law enforcement of suspicious circumstances that suggest a rider may be in danger.

229. The Uber App also failed to communicate with Plaintiff a true expectation of the lack of safety in using Uber.

230. These flaws in the design of the Uber App, were a substantial factor in causing harm to the Plaintiff, which included being assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

231. As a direct and proximate result of Uber's acts and omissions, Plaintiff suffered economic and non-economic damages.

232. Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

### CLAIM 10: STRICT PRODUCT LIABILITY - FAILURE TO WARN

233. Plaintiff incorporates all prior allegations.

234. Uber manufactured and distributed the Uber App.

235. The Uber App presented potential risks of introducing each driver to a passenger who, because of the nature of the ridesharing arrangement created and facilitated by the Uber

App, could neither escape from the Uber driver's vehicle nor control the place where the driver would take the passenger, which could result in the sexual assault of that passenger; these are risks that were known or knowable at the time of manufacture and distribution of the Uber App.

236. The potential risks presented a substantial danger when the Uber App was used or misused in an intended or reasonably foreseeable way.

237. Ordinary consumers such as Plaintiffs would not have recognized the potential risks.

238. Defendant Uber failed to adequately warn consumers, including Plaintiffs, of these potential risks.

239. Uber's failure to provide passengers, including Plaintiffs, with sufficient warnings regarding the risk of harm to which they were being exposed with each Uber ride was a substantial factor in causing the harm suffered by Plaintiffs, including being sexually assaulted, sexually battered, raped, falsely imprisoned, stalked, harassed, and/or otherwise attacked by an Uber driver which humiliated, degraded, violated, and robbed Plaintiffs of their dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and or psychological harm from which she may never fully recover.

240. As a direct and proximate result of Uber's acts and omissions, Plaintiff suffered economic and non-economic damages.

241. Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper,

including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

## VICARIOUS LIABILITY FOR DRIVER'S TORTS

242.   Plaintiff incorporates all prior allegations.

243.   Uber is vicariously liable for the acts of its drivers by statute.

    a.   Uber is a transportation network company subject to California Public Utilities Code section 5354.

    b.   Public Utilities Code section 5354 provides, in pertinent part, that the "act, omission, or failure of any . . . person offering to afford the authorized service [transportation] with the approval or consent of the permit or certificate holder [Uber] is the act, omission, or failure of the permit or certificate holder [Uber]."

    c.   The Uber driver, at all relevant times, was a person offering to afford the transportation service with the approval and consent of Uber.

    d.   Uber was, at all relevant times, a permit or certificate holder subject to Public Utilities Code section 5354.

244.   At all relevant times, the Uber driver was Uber's employee for purposes of common law respondeat superior liability.

    a.   At all relevant times, Uber exercised control over the Uber driver's work by dispatching the Uber driver to particular locations and passengers, instructing him regarding the route to use, instructing him regarding decals to place on his vehicle, setting the fares and rates, limiting his ability to see where he will

be driving before he accepts a ride, instructing him via his conduct during passenger rides, monitoring his speed and route while rides were in progress, specifying the manner of payment, accepting payment on his behalf, gathering feedback from his passengers, tracking his performance, and reserving the right to terminate drivers with or without cause.

b. At all relevant times, Uber supplied the equipment and tools of work to the Uber driver by supplying the decals, map tools, communication tools, and payment acceptance tools, among other things.

c. The work that the Uber driver was doing, namely providing transportation services, was part of Uber's regular business in that Uber was and is in the business of providing transportation.

d. Before he began doing rideshare work for Uber, the Uber driver had not been a professional driver. He did not have a distinct occupation or business as a professional driver. He was simply a lay person with a vehicle.

e. The work performed by the Uber driver did not require specialized or professional skill, in that he was simply driving passengers from one location to another.

f. The Uber driver was not hired to do one or several discrete projects, but was rather hired to perform work for Uber over a long, and even indefinite, period of time.

245. At all relevant times, the Uber driver was acting as an agent of Uber in that Uber had given him authority to transport passengers on its behalf, and he was acting within that authority while he was transporting Plaintiff.

246.     At all relevant times, the Uber driver was acting within the scope of his employment and/or agency with Uber.

   a.  The nature of the Uber driver's work gave him unique power over passengers like Plaintiff, including the ability to exercise general control over their liberty by activating locks or operating the vehicle in a manner that prevents the passenger from exiting the vehicle, thereby restraining and keeping her in an isolated setting (a private vehicle). The Uber passengers, such as Plaintiff, have limited means to escape, thus increasing the risk for sexual violence.

   b.  Uber drivers, including the Uber driver, occupied a unique position of trust in society insofar as Uber riders like Plaintiff were trusting these drivers to take them from point A to point B without incident.

   c.  At all relevant times, the Uber driver was on duty as an Uber driver.

   d.  At all relevant times, Plaintiff was exposed to injury by the Uber driver because of the unique power he exercised over her in his capacity as an Uber driver, and because of the trust she placed in him because of his unique position of trust as an Uber driver.

   e.  The Uber driver's sexual assault, harassment and/or other attack of Plaintiff was reasonably foreseeable in light of Uber's business, including the situational risks presented by granting to a large fleet of non-professional drivers control over a trusting population of passengers who would ride alone and isolated in a vehicle, with their liberty potentially restrained by their drivers.

247.    At all relevant times, Uber as a common carrier had an absolute duty to protect its passengers from assault by its own employees and agents, and was therefore vicariously liable for the sexual assault, battery, harassment, and/or other attack which the Uber driver perpetrated on Plaintiff, whether or not that conduct occurred in the course and scope of employment.

248.    At all relevant times, Uber as a common carrier had a nondelegable duty for the safety of its passengers and was therefore liable for the sexual assault, harassment, and/or other attack which the Uber driver perpetrated on Plaintiff, whether or not that conduct occurred in the course and scope of employment.

    a.  As a common carrier which owes its vulnerable passengers, such as Plaintiff, an utmost duty of heightened care, Uber has a non-delegable duty to transport its passengers safely.

    b.  The doctrine of nondelegable duty recognizes that, for public policy reasons, certain duties cannot be delegated to a third party. The doctrine recognizes that an entity may not delegate its duties to a contractor to evade its own responsibilities. This is especially so when allowing delegation would incentivize the employers to hire incompetent contractors to further the employer's pecuniary interests.

    c.  In advertising to passengers, including Plaintiff, that Uber provides them a safe ride to their destinations, and by profiting off women who use Uber for that very purpose but then are attacked, Uber has a duty to its passengers that cannot be delegated. To allow Uber to delegate the liability for the assaults committed by its drivers to anyone else would encourage Uber to continue to utilize the cheapest, fastest, and most haphazard safety procedures. Uber

would be disincentivized from hiring only competent drivers, since the more drivers Uber has, the more money Uber makes.

d. Uber drivers act as agents of and operate as extensions of Uber. Uber drivers represent Uber's business and further Uber's pecuniary interests.

e. Uber drivers display the Uber logo when interacting with passengers, and in many cases Uber drivers are the only people with whom Uber's passengers have direct contact. Uber drivers provide the service that Uber claims to provide—transportation.

249.   The Uber driver at all relevant times was acting as Uber's ostensible agent.

a. Through its advertising, Uber intentionally encouraged its customers to identify the Uber decal as indicating that a driver with a decal is a safe and authorized Uber driver who had been vetted by Uber, and was being held out by Uber as a trustworthy driver.

b. Uber gave the Uber driver its decals, and had him place the decals on his vehicle to identify himself as an Uber driver.

c. Uber granted the driver the authority to transport its passengers and represent its business in doing so.

d. By allowing Uber drivers to represent Uber's business, Uber creates the impression that its drivers, including the Uber driver at issue here, were Uber's employees and/or agents.

e. Plaintiff reasonably believed that the Uber driver was an employee or agent of Uber, and, relying on this belief, got in a vehicle with him in exchange for a fee and suffered harm as a result of her contact with the driver.

250.     As a direct and proximate result of the Uber driver's tortious conduct, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked, which humiliated, degraded, violated, and robbed Plaintiff of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

251.     As a direct and proximate result of Uber driver's tortious conduct for which Uber is legally liable, Plaintiff has suffered economic and general, non-economic damages according to proof.

252.     Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

**VICARIOUS LIABILITY FOR SEXUAL BATTERY**

253.     Plaintiff incorporates all prior allegations.

254.     The Uber driver made harmful and offensive contact with the Plaintiff. Plaintiff did not consent to the contact. Plaintiff was harmed and offended by the Uber driver's contact. The Uber driver intentionally and recklessly committed acts that resulted in harmful contact with Plaintiff's person, and/or touching of Plaintiff in a sexual manner.

255.     As a result of the Uber driver's sexual battery of the Plaintiff, which occurred while in the course and scope of Uber driver's employment, Plaintiff was humiliated, degraded,

violated, and robbed of her dignity and personal safety. The depraved attack on Plaintiff caused Plaintiff to suffer physical and/or psychological harm from which she may never fully recover.

256.    As a legal result of the sexual battery committed by the Uber driver, and Uber's liability and vicarious liability for the same, Plaintiff suffered economic and non-economic damages.

257.    Plaintiff will seek actual and punitive damages based on Defendants' above-described actions, which evidence wanton and reckless disregard for the safety of passengers like Plaintiff.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

**<u>PUNITIVE DAMAGES</u>**

258.    Plaintiff incorporates all prior allegations.

259.    As stated above, Uber knew that it faced an ongoing problem of sexual predators driving for Uber and assaulting its passengers. As early as 2014 Uber knew that its drivers were physically and/or sexually assaulting female passengers. Since 2014, Uber has received frequent passenger complaints about driver physical and/or sexual misconduct, including physical and/or sexual assault and rape, it has been notified of police investigations of the criminal physical and/or sexual conduct of drivers acting within their capacity as Uber drivers, and it has been the subject of numerous civil suits and/or arbitrations alleging the sexual harassment and physical and/or sexual assault of Uber's passengers by Uber's drivers.

260.     Nevertheless, even though Uber was fully aware of its sexual predator problem it failed to take safety precautions to protect its passengers.

261.     Even after Uber was aware some Uber drivers were using driving for Uber as an opportunity to get unsuspecting women into their vehicles and to physically and/or sexually assault them, Uber and its executing officers made the conscious decision not to implement measures to thoroughly vet its drivers before and after hiring them.

262.     The decision not to implement more thorough and persistent background checks was driven by Uber executives' desire for rapid expansion and increased profits, because the more drivers driving for Uber, the more money there was to be made. Prioritizing profits over safety, Uber and its executive officers also made the conscious decision not to warn its customers/users of the risk of being assaulted even after Uber and its leadership were fully aware of this risk.

263.     Safety precautions such as enhanced background checks; biometric fingerprinting; job interviews; electronic monitoring systems; ongoing monitoring of Uber drivers and rides through available technology including cameras and GPS; a zero-tolerance policy for drivers who deviate from expected behavior by leaving the vehicle with passengers or by deviating substantially from the assigned route; a warning system for when a driver significantly deviates from the intended route or prematurely terminates a ride; a system for checking in with and verifying a passenger's safety when a driver prematurely terminates a ride or significantly deviates from the intended route; a zero-tolerance program for sexual assault and guidelines mandating immediate termination; a zero-tolerance policy for fraternizing with passengers; creating and instituting a system encouraging customer reporting; adequate monitoring of customer complaints by well-trained and effective customer-service

representatives; warnings to passengers of the dangers of being attacked by Uber drivers; and cooperation with law enforcement when a driver attacks a passenger would have cost Uber money and reputational damage. Because of this, Uber, at the direction of its corporate officers, decided not to implement such precautions and instead has continued to place its passengers at greater risk of kidnapping, sexual assault, rape, and exploitation by Uber's own drivers.

264.    Prioritizing profits over passenger safety, Uber and its executive officers acted, and continue to act, recklessly and in knowing, conscious disregard of the safety of its passengers, including that of Plaintiff, and the public.

265.    As a direct and proximate result of the intentional, negligent, reckless, grossly negligent conduct of Uber, Plaintiff was assaulted, battered, harassed, and/or otherwise attacked by the Uber driver, which humiliated, degraded, violated, and robbed her of her dignity and personal safety.

266.    The depraved attack on Plaintiff caused Plaintiff to suffer serious emotional distress as well as physical and/or psychological harm from which she may never fully recover.

267.    As a result of Uber's misconduct as stated above, Plaintiff seeks punitive damages to punish Uber for its misconduct and to deter future misconduct.

**WHEREFORE** Plaintiff demand judgment against Defendants for damages, including pre-judgment and post-judgment interest, and any other relief this Court deems just and proper, including attorneys' fees should they establish a legal basis for entitlement to attorneys' fees in this case.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: January 13, 2026

Respectfully Submitted,

**THE CLAUSE LAW GROUP**
2336 SE Ocean Blvd., #355
Stuart, Florida 34996
Phone: (772) 341-5855
Fax: (772) 410-3494

/s/___George E. Clause II_____
George E. Clause II, Esq.,
Fla. Bar No. 1022682
Primary Email: gclause@clauselawgroup.com
Attorney for the Plaintiff